IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs December 3, 2018

IN RE L.T.

Appeal from the Juvenile Court for Shelby County
No. AA4634          David S. Walker, Judge

_____

No. W2018-00931-COA-R3-JV

_____

In this child custody case, father petitioned the court to modify a prior custody order
designating mother as the primary residential parent of their child, L.T. Father alleged
that there had been a material change in circumstance in that mother refused to adhere to
the court's visitation order on numerous occasions. *See* Tenn. Code Ann. § 36–6–
101(a)(2)(B) (2018). After a hearing, the court agreed. It held that it was in the best
interest of the child to award joint custody to mother and father, with father designated as
the primary residential parent. Mother appeals. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court
Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which RICHARD H.
DINKINS and KENNY ARMSTRONG, JJ., joined.

Aaron S. Ayers, Memphis, Tennessee, for the appellant, D.C.

No appearance by or on behalf of, B.T.

**OPINION**

**I.**

In January 2014, mother, D.C., and father, B.T., had one child together, L.T.
Following her birth, father petitioned the court for visitation rights. On October 20, 2014,
the juvenile court granted father's petition. His visitation privileges included custodial
rights on alternating weekends and holidays and additional select periods of visitation.
The court awarded each parent regular telephone conversation with the child between
7:00 and 7:15 p.m. on non-custodial nights. On November 19, 2014, the court ordered
father to pay $1,350 per month in child support; the court also awarded mother $11,650

- 1 -

in retroactive child support. The parents were granted joint custody of the child; mother was designated the primary residential parent.

On January 13, 2015, father petitioned the court to modify his visitation due to a change in his work schedule. On May 8, 2015, while father's petition was pending, mother filed a petition to modify visitation alleging that father failed to fulfill several of his obligations to her and L.T. Mother stated that she moved to Little Rock, Arkansas with the child, and that father had taken the child out of the state without notifying her. She alleged that father "neglected child's medical needs while in his care causing [mother] to rush her to urgent care within the hour after" L.T. was transferred to her custody. She further alleged that father failed to provide medical and feeding schedules to her, as recommended by the court; that father made derogatory remarks about her in front of the child, on social media, and in front of others; and that on "several occasions [father] has posted pictures of [L.T.] bathing and nude on his social media accounts." Mother requested that she have "sole custody of minor child and [that father have] specific visitation."

On July 29, 2015, the parties appeared for a hearing before a magistrate. At the conclusion of the hearing, father's attorney was instructed to prepare and file an order reflecting the court's judgment; however, the order was not filed. On January 5, 2016, the court again instructed the parties to file an order reflecting the court's July 29, 2015 judgment; on March 16, 2016, the order was filed. The order directed that the parties are to have joint custody, with mother designated as the primary residential parent. The court adopted father's proposed parenting schedule tailored to his non-traditional work schedule. The court granted the parents alternating two-week periods of residential parenting time. Both parents were permitted to travel anywhere with the child within the United States, with notice required for any state other than Tennessee or Arkansas, including airline information. The court did not require the parties to share childcare information.

Mother filed a request for a rehearing before a judge.[1] The hearing was held; on May 12, 2016, the court entered an order reflecting its decision and enumerating visitation and custodial rights between the parents. The court stated that the parties are to have joint custody, with mother remaining the primary residential parent. The court ordered specific dates on which father is to be the residential parent. The court divided holidays between the parents on even and odd years. In the event father was unable to exercise any of his holiday-parenting time due to work conflicts, the court permitted father to make up the lost visitation time. Father was directed to provide mother with at least 30-day's notice of any work-schedule changes. Mother was directed to provide father with L.T.'s therapy schedule; father was similarly directed to provide L.T. with

---

[1] *See* Tenn. Code Ann. § 37-1-107 (permits parties to request a *de novo* hearing, before a juvenile court judge, of a matter heard before a magistrate).

adequate and appropriate medical care while she was in his care. Father was ordered to provide L.T.'s feeding and diaper changing schedule to mother. The parties were ordered to provide each other with contact information for child care providers. Each parent was granted the right to call and speak with L.T. at 7:00 p.m. each night when the child was in the care of the other parent or a third-party caregiver, unless it was an exchange day. The court also noted that the child was allowed to initiate additional calls and ordered that the parents "not impede or interfere with [L.T.'s] access to either parent by telephone." The court acknowledged that father had added L.T. as a qualified military beneficiary.

On May 31, 2016, about two weeks after the Tennessee court entered its order granting the parents joint custody, mother testified that she went to the "Attorney General's Office" in her home state of Arkansas and obtained a "letter of no contact" against father. Mother's justification for obtaining the no-contact letter was that father harassed mother and he would call "[child] at 6:00 p.m., even though the Court Order time will be 7:00, his calls will start from 6:00 p.m. until 7:00 p.m. at night." Despite the court having granted the parents joint custody, this letter allegedly instructed father to cease all contact with mother, which, in effect, prevented him from contacting his then two-year old daughter as well.

On November 17, 2016, father filed a petition to modify the May 12, 2016 custody order. He alleged that there had been a material change in circumstance. He stated that mother "does not foster a positive relationship [between] father and [L.T.]" and that mother continues to disregard the court ordered visitation schedule frustrating father's access to L.T. Father requested that the custody order be modified so that father is designated as the primary residential parent.

On April 26, 2017, the court held a hearing on father's petition. On May 22, 2017, the court entered an order granting father's petition to modify the May 12, 2016 order. The court held that

> mother has willfully and intentionally deprived [L.T.] of a meaningful relationship with her father; that she has refused to comply with the Court's visitation order on numerous occasions; and that it is in said child's best interest to be placed in the primary custody of her father.

The court permitted the parties to change its visitation order, without the participation of the court, if both parents agree and the revised schedule is in writing signed by both parents. Mother filed another request for a rehearing.

On May 24, 2017, mother also filed a petition for criminal contempt against father. Therein, she alleged that father has failed to properly meet the child's medical and

therapeutic needs. On May 26, 2017, mother filed an emergency petition to modify custody. Mother alleged that father

> has a history of violence against [mother], that he has not disclosed to [mother] who babysits the child, that he has medically neglected the child and that father returns the child to [mother] with yeast infections. Further, that the father does not have a valid driver's license, that the child is not being adequately supervised by the father, that the father has informed [mother] that she may not telephone the child if the child is upset, and that child suffers from developmental delay and that the father was to provide therapy for the child and has not done so, and that the child is not eating properly when with the father.

On July 21, 2017, mother also filed a motion for recusal of the magistrate. That motion was denied, because there were no sustainable grounds for the motion, and "[m]oreover, as a practical matter, the request for a hearing pursuant to Tennessee Code Annotated, Section 37-1-107(d) requires another judge to hear the case making the motion moot."

On April 23, 2018, a hearing was held on mother's petition for citation for criminal contempt, on her emergency petition to modify custody, and the rehearing on father's petition to modify the court's May 12, 2016 order. Mother was represented by counsel. Father appeared *pro se*. As to the petition for contempt pending against him, father waived his right to be represented by counsel.

At the hearing, father explained why he petitioned the court to modify the custody arrangement:

> [mother's] refusal to work with my schedule made it difficult to see my daughter for more than one weekend a month. It has always been my strong desire to co-parent peacefully, but unfortunately it takes both sides to cooperate, and [mother's] actions show time and time again that she is only interested in the exact opposite.
>
> She continuously causes me grief with no regard for the consequences of her actions, even at the expense of my daughter's well-being…Prior to that Agreed Order I had already not seen my daughter for two -- for about two months due to [mother's] refusal to deliver her. [Mother] never did comply with the Agreed Order. Nearly every month for the

next 14 months I drove an hour and a half to Brinkley, Arkansas, where the exchange was supposed to take place.

Although I knew she wouldn't be there, I always ended up breaking my own heart with the hopes that she would be. All I had were the phone calls, which became more and more difficult to hear or get a response from my daughter. Eventually every call went straight to voicemail and had been that way since mid-2016.

I felt -- I left messages and I texted, but the only response I got was a letter from the prosecuting attorney in Arkansas advising me to cease and desist contact with [mother].

At a child support hearing I mentioned that [mother] hadn't been delivering [child] for visitation. She claimed that there was no order for visitation, despite having an Agreed Order, which was granted six months prior. The Magistrate located the Order in the file and read it to her in Court. In spite of that she continued to keep [child] from me for the next nine months.

Her willful disregard for the Court Order is the same regard she has for mine and [child's] relationship, not just mine, but my family's, also. She didn't meet her little brother until he was 15 months old. I was finally able to get [mother] to Court for a change of custody hearing after 504 days of not seeing my daughter.

*       *       *

Since the change of custody [mother] has been relentless in trying to make me out to be an unfit parent. She has called the police on me and my fiancé several times and Child Protective Services was called on myself and the baby sitter. She is constantly claiming that [child] has medical issues…Sometimes I take [child] to the doctor because [mother] claims she had issues at her house that she says started before she picked her up, but nothing would be wrong.

*     *     *

> She's even filed a Restraining Order against me with false allegations, which resulted in limited communication between us. I can't even tell her if [child] is sleeping when she calls. Sometimes I feel so defeated with everything she tries to do with me -- do to me, and recordkeeping gets so tiresome…It's been a year since [child] started living with me and now I can't imagine anything any other way. I have been a great custodian and parent and will continue to be, despite the opposition. I have always tried to be fair and tolerant toward [mother] and if there were ever an incident that a visitation order did not exist, I would still make sure my daughter had a relationship with her mother. I very respectfully ask the Court that I remain the custodial parent.

The court asked father why he felt it was in the best interest of the child that he be designated the primary residential parent. Father testified that he would do as the court ordered and ensure that mother's parenting time is honored and that it occurs without interference. He testified that he wants the child "to have both of us in her life."

Mother testified that father's representations regarding visitation "were false." She testified that father voluntarily forfeited his visitation time for various reasons. Mother testified that L.T. has sensory issues, feeding delays, developmental delays, and other special needs. Mother argued that father fails to provide the medical and therapeutic attention necessary to meet the child's special needs. Mother has experience working with "multi-handicapped students" and testified that she can and does give L.T. the "best quality of care." Father countered that he has asked mother on several occasions for specific information, medical notes, or other documentation regarding the precise nature of L.T.'s medical and developmental issues, but that mother largely ignores his requests. Father testified that he has taken L.T. to the doctor for the purported issues, but that L.T. does not display any developmental or sensory issues when under his care.

Following the hearing, the court denied mother's petition for criminal contempt. The court held that father had proven a material change of circumstance since the May 12, 2016 order. The court then, in accordance with the factors enumerated in Tenn. Code Ann. § 36-6-106(a), considered what was in the best interest of the child. In its May 15, 2018 order, the court enumerated its findings, and held that it is in the child's best interest that joint custody is granted to father and mother, with father designated the primary residential parent. Mother appeals.

- 6 -

## II.

Mother raises the following issues:

> Whether the trial court erred in dismissing mother's emergency petition to modify custody.
>
> Whether the trial court erred in holding that father demonstrated a material change in circumstance, and that changing the joint custody arrangement would be in the child's best interest.

## III.

The determination of whether a material change in circumstance has occurred, and whether such a change necessitates a change in the parenting arrangement, are both questions of fact for the trier of fact. *See **In re T.C.D.,*** 261 S.W.3d 734, 742 (Tenn. Ct. App. 2007). We review the trial court's findings of fact *de novo* on the record, presuming those findings to be correct unless the evidence preponderates otherwise. ***Hass v. Knighton,*** 676 S.W.2d 554, 555 (Tenn. 1984); Tenn. R. App. P. 13(d). In weighing the preponderance of the evidence, findings of fact that are based on witness credibility are given great weight, and they will not be overturned absent clear and convincing evidence to the contrary. ***In re Adoption of A.M.H.,*** 215 S.W.3d 793, 809 (Tenn. 2007).

Trial judges, who have the opportunity to observe the witnesses and make credibility determinations, are better positioned to evaluate the facts than appellate judges. ***Massey–Holt v. Holt,*** 255 S.W.3d 603, 607 (Tenn. Ct. App. 2007). In addition, we recognize that "[t]rial courts are vested with wide discretion in matters of child custody" and that "the appellate courts will not interfere except upon a showing of erroneous exercise of that discretion." ***Koch v. Koch,*** 874 S.W.2d 571, 575 (Tenn. Ct. App. 1993). The welfare of the child is the paramount consideration.

## IV.

### A.

A petition to modify custody involves a two-part analysis. *See* Tenn. Code Ann. § 36–6–101(a)(2)(B). First, the court must determine whether there has been a material change in circumstance since the last custody order. A material change in circumstance "may include, but is not limited to, failures to adhere to the parenting plan or an order of custody and visitation or circumstances that make the parenting plan no longer in the best interest of the child." Tenn. Code Ann. § 36–6–101(a)(2)(B). The party seeking a change in the designation of primary residential parent has the burden to establish that a material

change in circumstance has occurred. ***Wall v. Wall***, No. W2010-01069-COA-R3CV, 2011 WL 2732269, at \*22 (Tenn. Ct. App. July 14, 2011). Upon a trial court's finding that a material change in circumstance affecting the children has occurred, it must then be determined whether the modification of custody from one parent to the other parent is in the child's best interests. ***McClain v. McClain***, 539 S.W.3d 170 (Tenn. Ct. App. 2017).

In mother's emergency petition, she argues that there has been a material change in circumstance, such that modification of custody in her favor is in the child's best interest. At the hearing, mother's primary argument was that father violates the court's order by medically and therapeutically neglecting their child. She introduced images of the child's naked body to evince "scratches and bruises that she had while with her father." She testified that the child is frequently returned from father's care with bruises and bug bites on her, such that the child would be physically safer with mother. She also alleged that father fails to care for the child's teeth. She maintains that issues with the child, predominately, if not exclusively, occur when the child is in the father's care.

Maternal grandmother similarly testified that father neglects the child. She testified that when the child returns from the father's care she is

> dirty and sometimes she would just cry and scratch and itch. I mean, she would just be itching and scratching and -- and several times -- matter of fact, I think it may have been the first time we picked her up, she was complaining of her vaginal area so we went over to LeBonheur. That was the first (inaudible) and we spent several hours there waiting to see a doctor. And since then it seems to be an ongoing thing.

Maternal grandmother testified that the daughter returns from father's care with the same dirty pair of shoes and that she generally emits a foul odor. She alleged that, since father has had possession of L.T., the child does not behave normally. Maternal grandmother testified that the child is now very angry and that her separation anxiety "is just unreal." She testified that father's household is chaotic and lacks structure. She testified that father works long hours and that his job interferes with his ability to properly care for the child.

However, and notably, when cross-examined by father, maternal grandmother admitted that she had never been to father's house. She admitted that she has never actually observed how his household is organized, and thus how he cares for the child. When asked what hours father works, maternal grandmother admitted that she does not know father's work schedule.

After listening to mother's testimony and observing her demeanor, the trial court held that she was not credible. This finding is supported by the record. Despite the allegations in her petition, the record does not indicate that father has a history of

violence toward mother. There is no credible indication that father medically or nutritionally neglects the child. The images submitted by mother, as purported evidence of father's neglect or abuse, do not support her allegation.[2] As stated by father, the minor scratches, bug bites, and occasional bumps on the child paraded by mother to the court as medical neglect indicate nothing more than typical marks one might find on an active four-year old child, if anything. Additionally and significantly, the court held credible father's testimony that he does not observe any developmental issues in the child and that he takes L.T. to the doctor for any issues that he does observe.

We hold that the evidence before us does not preponderate against the court's findings and its holding that mother failed to carry the burden on her emergency petition to modify custody, in that she failed to evince a material change in circumstance. We affirm the dismissal of mother's emergency petition.

Turning to father's petition, his primary argument for a material change in circumstance is that mother refuses to adhere to the court's visitation schedule. As noted elsewhere in this opinion, father testified to the several ways that mother has continuously and persistently frustrated his ability to see his child. As evidence of mother's persistent refusal to adhere to the custody order, father presented pictures of himself at the Brinkley police station unsuccessfully attempting to meet mother for the custody exchange. Father made purchases and used the receipts as a means of further evincing his unsuccessful attempts to pick up his daughter for visitation. He also testified regarding numerous text messages he sent to mother, spanning several months, attesting to her failure to show up for the court-ordered exchanges. Furthermore, father presented recordings indicating that his calls were being directed to voicemail during his scheduled call times.

Father testified regarding mother's refusal to provide him with specific medical information about their daughter. Father stated that when he was finally able to receive L.T.'s medical records, after he became the custodial parent, he learned about several medical events mother had not told him about, including that L.T. had bumped her head in school, that she has two crowns in place of her front teeth, and that she wakes up at night screaming. Father testified that mother refuses to provide him detailed medical or developmental information because "she's trying to set me up for failure." Again, and significantly, the trial court "assessed the credibility and demeanor of the witnesses as they testified," and held "that father was [the] credible witness."

Conversely, mother testified that father is misrepresenting why he was unable to see his daughter. She testified that the reason father failed to exercise his right to

---

[2] The trial court noted, from the bench, its concern regarding the photographs presented as evidence by mother at the hearing: "mother is taking nude photographs of the child to [] try to build a case or have evidence in the case. That is concerning for the Court and I find that that's not appropriate." *See* Tenn. Code Ann. § 36-6-106(15).

visitation is that he forfeited his time with the child on several occasions, and that on other occasions he was otherwise unavailable to care for the child. We note that, even if we assume, *arguendo*, that father was unable to exercise his visitation rights at times, as argued by mother, that would still not have permitted mother to preclude father from exercising his visitations rights on the occasions when he was able to take custody of the child.

Father argued that mother's position that he forfeited his visitation time was illogical, because it is not possible to forfeit visitation time that mother was entirely refusing to allow him to have. At the hearing, father asked mother about this logical anomaly. Mother simply testified that she had obtained a "no contact order" against father, and then she summarily denied the existence of a visitation order granting rights to father during the relevant period:

> [Father]: I want her to respond if it's possible for me to forfeit my visitation in June, November and December when she never complied with the Order of February, 2016.
>
> [Mother]: I had a No Contact Order and I did not have an Order during that time.
>
> [Father]: So but is it possible for me to forfeit my visitation if I wasn't –
>
> [Mother]: I had a No Contact Order and I did not have an Order at that time.
>
>                     \*       \*       \*
>
> [Father]: So -- okay. So just to clarify, in 2016 I didn't provide -- even thought I didn't have the child, I didn't provide therapy for [child] because I did not have insurance. My next question, is that correct?
>
> [Mother]: I think it's important to note that you're saying 2016, but you did see [child] in parts of 2016.
>
> [Father]: What parts would that be?

- 10 -

[Mother]:     If I'm -- let me check the Court Orders. I don't know which Court Order. We had a letter of no contact May 31st [2016]. I don't know when the last Court order was done, was it 2015? So you may not, I don't know what you had in 2016…

Mother's testimony supports father's position that she refused to acknowledge father's visitation rights for the relevant period. Instead, mother obtained and used a specious no contact letter to prevent father from communicating with mother, and in effect with his daughter.

It is clear from the record that mother has intentionally and unjustly prevented father's access to his daughter. Additionally, it is clear from mother's testimony that she is unwilling to even consider allowing the child to spend time with her father absent a court order, and even then her lack of adherence in the past renders her cooperation dubious. Mother's intentional obstruction of father's court-ordered access to the child, and disregard of the court's rulings, supports the court's holding, as to father's petition, that a material change in circumstance had occurred.

**B.**

Once a material change in circumstance has been established, the court must then proceed to the second step in the analysis and determine whether the modification sought is in the child's best interest, in light of the factors enumerated in Tenn. Code Ann. § 36–6–106(a). Custody determinations "shall be made on the basis of the best interest of the child." Tenn. Code Ann. § 36-6-106(a) (2018). To that end, the statute instructs the court to order

> a custody arrangement that permits both parents to enjoy the maximum participation possible in the life of the child consistent with the factors set out in this subsection (a), the location of the residences of the parents, the child's need for stability and all other relevant factors.

Tenn. Code Ann. § 36-6-106(a); subsection (a) includes the following best interest factors:

> (1) The strength, nature, and stability of the child's relationship with each parent, including whether one (1) parent has performed the majority of parenting responsibilities relating to the daily needs of the child;

- 11 -

(2) Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child. In determining the willingness of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent and caregiver to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent or any caregiver denying parenting time to either parent in violation of a court order;

(3) Refusal to attend a court ordered parent education seminar may be considered by the court as a lack of good faith effort in these proceedings;

(4) The disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care;

(5) The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities;

(6) The love, affection, and emotional ties existing between each parent and the child;

(7) The emotional needs and developmental level of the child;

(8) The moral, physical, mental and emotional fitness of each parent as it relates to their ability to parent the child. The court may order an examination of a party under Rule 35 of the Tennessee Rules of Civil Procedure and, if necessary for the conduct of the proceedings, order the disclosure of confidential mental health information of a party under § 33-3-105(3). The court order required by § 33-3-105(3) must contain a qualified protective order that limits the dissemination of confidential protected mental health information to the purpose of the litigation pending before the court and provides for the return or destruction of the

- 12 -

confidential protected mental health information at the conclusion of the proceedings;

(9) The child's interaction and interrelationships with siblings, other relatives and step-relatives, and mentors, as well as the child's involvement with the child's physical surroundings, school, or other significant activities;

(10) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

(11) Evidence of physical or emotional abuse to the child, to the other parent or to any other person. The court shall, where appropriate, refer any issues of abuse to juvenile court for further proceedings;

(12) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child;

(13) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preference of older children should normally be given greater weight than those of younger children;

(14) Each parent's employment schedule, and the court may make accommodations consistent with those schedules; and

(15) Any other factors deemed relevant by the court.

Tenn. Code Ann. § 36-6-106(a).

None of the above factors were held by the court to favor mother. The court held that factors two (2), nine (9), ten (10), and eleven (11) favor father. The above discussion elucidates the fact that the evidence does not preponderate against the trial court's conclusion that father is the parent who most demonstrates the willingness to continue to facilitate and encourage a healthy relationship between the child and the other parent. *See* Tenn. Code Ann. § 36-6-106(a)(2). In addition, the record supports the trial court's findings as to the additional factors favoring father. Accordingly, the trial court did not abuse its discretion in holding that designating father as the primary residential parent is in the best interest of the child.

- 13 -

## V.

The judgment of the trial court is affirmed. Costs on appeal are taxed to the appellant, D.C. Case remanded for enforcement of the trial court's judgment and collection of costs assessed below.

_____
CHARLES D. SUSANO, JR., JUDGE